## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

RACHEL COLEMAN,             )
                    )
          **Plaintiff,**        )
                    )
**v.**                    )     **Case No. 21-CV-0430-CVE-JFJ**
                    )
**STATE FARM FIRE AND CASUALTY,**  )
**COMPANY**              )
          **Defendant.**      )

## OPINION AND ORDER

Before the Court is defendant's motion for summary judgment (Dkt. # 37), plaintiff's response (Dkt. # 54), and defendant's reply (Dkt. # 58). The case arises from an insurance claim dispute regarding the extent of and coverage for fire and smoke damage to plaintiff's personal property. Dkt. # 2-1. On September 7, 2021, plaintiff Rachel Coleman filed a petition in the District Court of Tulsa County, Oklahoma (Dkt. # 2-1) against defendant State Farm Fire and Casualty Company (State Farm) alleging breach of contract and tortious failure to render good faith and fair dealings (bad faith). Id. at 2-3. Plaintiff seeks actual damages based on defendant's alleged breaches, id. at 3-4, and alleged entitlement to punitive damages for bad faith. Dkt. # 37, at 6. On October 6, 2021, defendant removed this case to federal court because the amount in controversy exceeds $75,000 and the parties are "residents and citizens of different states." Dkt. # 2, at 2. Defendant State Farm now moves, pursuant to Fed. R. Civ. P. 56, for summary judgment on plaintiff's breach of contract claim, bad faith claim, and the issue of punitive damages. Dkt. # 37. Defendant argues that there is a legitimate dispute as to the plaintiff's demand for the replacement cost value of the entire contents of her home. Dkt. # 37. Plaintiff responds that she followed the

instructions given to her by State Farm employees and, as a result, State Farm refuses to compensate her for the loss under her policy.  Dkt. # 54, at 2-3.

# I.

The following facts are not in dispute: on October 25, 2020, "an attic fire/smoldering event" occurred at plaintiff's home.  Dkt. # 37, at 9; Dkt. # 54, at 3.  At the time, plaintiff's property was insured under State Farm policy number 36-B5-V014-7.  Dkt. # 37, at 6; Dkt. # 54, at 3.  Plaintiff's policy "provided [d]welling [c]overage with a [p]olicy [l]imit of $157,600, . . . covered loss of personal property with a limit of $118,200," and "[l]oss of [u]se [c]overage" with a limit of $47,280.  Dkt. # 37, at 6-7, 8; Dkt. # 54, at 3.  Plaintiff's coverages "were subject to a $1,576 deductible." Dkt. # 37, at 8; Dkt. # 54, at 3.  The personal property coverage at issue in this case applies "for accidental direct physical loss to the property . . . caused by the following perils . . . fire or lightning . . . , smoke."  Dkt. # 37, at 7; Dkt. # 54, at 3.  As to the settlement of losses to personal property, the policy states:

> **COVERAGE B – PERSONAL PROPERTY**
> **1. B1 – Limited Replacement Cost Loss Settlement**
> a. *We* will pay the cost to repair or replace property covered under **SECTION I – PROPERTY COVERAGES, COVERAGE B – PERSONAL PROPERTY**, except for property listed in item b. below, subject to the following:
> (1) until repair or replacement is completed, *we* will pay only the *actual cash value* of the damaged property;
> (2) after repair or replacement is completed, we will pay the difference between the *actual cash value* and the cost *you* have actually and necessarily spent to repair or replace the property;
> (3) if property is not repaired or replaced within two years of the date of the loss, *we* will pay only the *actual cash value*.

Dkt. # 37, at 7; Dkt. # 54, at 3.  The policy also "contained conditions for coverage specific to personal property":

**Section I – Conditions**
2. **Your Duties After Loss**. After a loss to which this insurance may apply, you must cooperate with us in the investigation of the claim and also see that the following duties are performed:

b.      protect the property from further damage or loss and also:
(1) make reasonable and necessary temporary repairs required to protect the property; and
(2) keep an accurate record of repair expenses;

c.      prepare an inventory of damaged or stolen personal property:
(1) showing in detail the quantity, description, age, replacement cost, and amount of loss; and
(2) attaching all bills, receipts, and related documents that substantiate the figures in the inventory;

d.      as often as *we* reasonably require:
(1) exhibit the damaged property;
(2) provide *us* with any requested records and documents and allow us to make copies.

Dkt. # 37, at 4-5; Dkt. # 54, at 3.

Plaintiff was not home when the fire started, and "[w]hen she returned home, the home was filled with smoke." Dkt. # 37, at 9; Dkt. # 54, at 4. On October 27, 2020, two days after the fire, plaintiff reported the loss to State Farm. Dkt. # 37, at 9; Dkt. # 54, at 4. Plaintiff reported that "the fire department determined the fire started in the attic as the result of old electrical wires." Dkt. # 37, at 9; Dkt. # 54, at 4. Plaintiff "reported damage to the attic beams, siding, roof, HVAC system, and miscellaneous personal property." Dkt. # 37, at 9; Dkt. # 54, at 4.

On October 28, 2020, State Farm claims representative Jerome Abbage was assigned to plaintiff's claim. Dkt. # 37, at 9; Dkt. # 54, at 4. That day, Abbage called plaintiff "to collect additional facts related to the loss and left [p]laintiff a voicemail requesting a return call." Dkt. # 37, at 9; Dkt. # 54, at 4. Abbage also hired an "[o]rigin and [c]ause [i]nvestigator to inspect the

loss." Dkt. # 37, at 9; Dkt. # 37-3, at 16.  On October 29, 2020, State Farm claim specialist Heather Stanley "scheduled an inspection of the loss with [p]laintiff for November 2, 2020," and the origin and cause inspection was scheduled for the same time. Dkt. # 37, at 9; Dkt. # 54, at 4.

On November 2, 2020, Stanley and the origin and cause investigator inspected plaintiff's home. Dkt. # 37, at 10; Dkt. # 54, at 4.  The origin and cause investigator "found that the fire started from wiring in a ceiling light and likely smoldered for hours."  Dkt. # 37, at 10; Dkt. # 54, at 4. Stanley reported "framing damages . . . to [five] ceiling joints from back to front," which required removing ceilings in multiples rooms and part of the hall.  Dkt. # 37, at 10; Dkt. # 54, at 4.  She also noted damage to a number of parts of the attic, that the "furnace should be replaced and floor ducts cleaned," that the "interior will all clean with PNT to WC," and that further inspection into reported leaking from the roof would occur after the ceilings are down.  Dkt. # 37, at 10; Dkt. # 54, at 4. Stanley "advised [p]laintiff the estimated repair time of the home was approximately three [] months." Dkt. # 37, at 10; Dkt. # 54, at 4.

Based on her findings, Stanley "approved FRSTeam to collect [p]laintiff's textiles and electronics for cleaning" and also "approved ESR to do the pack out and cleaning of [p]laintiff's personal property." Dkt. # 37, at 10; Dkt. # 54, at 4.  "At the same time," Stanley "advanced $500 to [p]laintiff in personal property coverage" after plaintiff told her that she "spent approximately [six] hours packing and moving her personal property in her home." Dkt. # 37, at 10; Dkt. # 54, at 4.  Also on November 2, 2020, Abbage "discussed personal contents with [p]laintiff" and "[p]laintiff agreed to create a list of items for replacement." Dkt. # 37, at 10; Dkt. # 54, at 4.  During her deposition, plaintiff testified that "Abbage told her she only needed to take photographs of damaged personal property items valued over $800" and that she discarded the contents at Abbage's direction,

4

"who advised her to throw any items away that were worth less than $1,000." Dkt. # 37, at 19; Dkt. # 54, at 6. Plaintiff also testified that Stanley "told [plaintiff] to throw things away-specifically that she told [plaintiff] to throw away every single food item, medicine, body product, beauty product, and makeup item." Dkt. # 37, at 19; Dkt. # 54, at 6.

On November 12, 2020, "FRSTeam notified State Farm [that] [p]laintiff declined FRSTeam's first attempt to collect the textile and electronics because [p]laintiff had a funeral to attend. FRSTeam had since been unable to reach [p]laintiffs [sic] despite multiple attempts to call her." Dkt. # 37, at 11; Dkt. # 54, at 4. That day, "Abbage followed up with [p]laintiff" and plaintiff "advised she would take care of all of the cleaning herself." Dkt. # 37, at 11; Dkt. # 54, at 4. The record shows that State Farm and plaintiff "had numerous communications" over several months about "State Farm's need for a contents list for items that needed cleaning or replacing" and that plaintiff was working on the list. Dkt. # 37, at 11; Dkt. # 37-3, at 10, 12, 14.

In January, 2021, plaintiff submitted two sets of inventory documents.[1]  At issue in this case is defendant's denial of the "lost item list," which contained "[twenty-two] pages of personal property inventory totaling $121,074.37 [that plaintiff] claimed was lost in the fire." Dkt. # 37, at

---

[1]    While defendant's statement of undisputed material facts (Dkt. # 37, at 12) and plaintiff's response to defendant's statement of undisputed material facts (Dkt. # 54, at 4) both state that plaintiff's "lost items list" (Dkt. # 28-1), was submitted on January 17, 2021, and plaintiff's "clean and restore list" (Dkt. # 28-2) was submitted on January 27, 2021, the record indicates these dates may be reversed. State Farm's claim file notes the "contents list" totaling $121,074.37 (the "lost item list") was received by State Farm on January 27, 2021  (Dkt. # 37-3, at 7-8), while plaintiff's email dated January 17, 2021 appeared to submit the clean and restore list, and included an attachment titled "Clean & Restore Spreadsheet - Jerome" (Dkt # 37-3, at 37). The Court recognizes the facts as presented in the record and proceeds with the understanding that the contents list totaling $121,074.37 was submitted to and received by State Farm on January 27, 2021. Ultimately, which document was sent on which date has no bearing on the Court's conclusions on this motion.

12; Dkt. # 54, at 4.  Among the items in the list were "thousands of dollars worth of faux wedding flowers, invitations, and décor" from plaintiff's wedding the month before the fire.  Dkt. # 37, at 12; Dkt. # 54, at 4.  On January 27, 2021, the day this list was noted in the claim file, Stanley noted that "based on her walk through of the house, most of the contents in the house were cleanable."  Dkt. # 37, at 12; Dkt. # 37-3, at 7-8.

On February 1, 2021, Abbage[2] spoke with plaintiff about the claim via telephone.  Dkt. # 27, at 12; Dkt. # 54, at 4.  Abbage noted that plaintiff said that "she threw all of the items on her [lost items] list away."  Dkt. # 27, at 12; Dkt. # 54, at 4.  Abbage noted that he asked plaintiff "if a professional company came and evaluated these contents" prior to them being discarded and that plaintiff said that "she had reached out to a couple of companies but had not heard back from them aside from FRSTeam for the textiles."  Dkt. # 37-3, at 7.  Abbage also noted that he asked plaintiff if "she took photos of these items prior to throwing them away" plaintiff stated that she had photos of "some of the items but not all of them."  Dkt. # 37-3, at 7.

On February 3, 2021, Abbage noted that he spoke "with Rudy at ESR" who "agreed that there just wasn't this many contents [from plaintiff's lost list] inside the home."  Dkt. # 37-3, at 6-7.  The note also states that ESR was "under the impression that they were going to do all of the pack out, cleaning, storage, etc [sic] but [plaintiff] decided that [she] would complete on [her] own."  Dkt. # 37-3, at 7.

---

[2]    While defendant's statement of undisputed material facts (Dkt. # 37, at 12) and plaintiff's response to defendant's statement of undisputed material facts (Dkt. # 54, at 4) both state that this conversation occurred between plaintiff and Stanley, the record states that the conversation was actually between plaintiff and Abbage.  Dkt. # 37-3, at 7.  The Court recognizes the facts as presented in the record and proceeds with the understanding that this conversation was between plaintiff and Abbage.

On February 9, 2021, plaintiff "sent an email to [] Abbage stating she sent photos of 'some' of the items on the inventory lists and that she took photos of items with value of more than $800-$1000 'like you [Abbage] requested.'" Dkt. # 37, at 13; Dkt. # 54, at 4.  On February 12, 2021, Abbage noted in the claim file that he again spoke with plaintiff and "advised her that these items [on her lost property list] would have needed to be evaluated by a professional company to decide whether they could be cleaned or needed to be discarded but she made this decision on her own with all of these items." Dkt. # 37-3, at 6.  He also noted that he advised plaintiff that he would "go through and pay her for the contents that are reasonable for replcmnt [sic]," and that for "the other items [he] will allow for some pack out time, cleaning, storage and then pay back only as [State Farm] can't eval[uate] the items now that they are discarded so nothing that can be done re those." Dkt. # 37-3, at 6.  Plaintiff recorded the February 12, 2021, telephone conversation between herself and Abbage.  Dkt. # 37, at 16; Dkt. # 54, at 5.

Also on February 12, 2021, plaintiff "sent a list of items she wanted immediate reimbursement for to replace and stated she had provided photos of 'almost' all of those items." Dkt. # 37, at 13; Dkt. # 54, at 4.  This request included "roughly $3,400 in food replacement costs." Dkt. # 37, at 13; Dkt. # 54, at 4.  On February 15, 2021, Abbage responded, "stating he would need the ages on those items and would also likely need purchase receipts on the larger items. [] Abbage advised once he had ages on the items, he could tell [plaintiff] specifically what receipts" he would need.  Dkt. # 37, at 13; Dkt. # 54, at 4.  Abbage also told plaintiff that "the amount being claimed for food seemed extremely high and he would need some sort of documentation that that amount of food was in the house at the time of the fire," but in the meantime, he "would reimburse $500 for food replacement." Dkt. # 37, at 13; Dkt. # 54, at 4.  Plaintiff responded that day "with the age of

the items and an explanation of the food situation[]"; however, plaintiff did not provide any "evidence supporting her explanation of the alleged $3,400 in food." Dkt. # 37, at 14; Dkt. # 54, at 4.

Following the February, 12, 2021, interactions, the facts presented in the parties' briefs and in the record turn to the defendant's handling of the "clean & restore" portion of plaintiff's claim, which are not necessary to rule on the motion before the Court.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). "[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery[,]" Fed. R. Civ. P. 56(b), including before any discovery has been conducted. "Movants for summary judgment bear the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." Silverstein v. Federal Bureau of Prisons, 559 F. App'x 739, 752 (10th Cir. 2014); see also Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Defendant State Farm moves for partial summary judgment on the following grounds:

a.    *Breach of Contract*

State Farm paid a portion of plaintiff's personal property coverage and "requested evidentiary documentation" for the rest of plaintiff's contents claim, "pursuant to [p]laintiff's duties under her [p]olicy," but plaintiff "failed to provide such documentation."  Dkt. # 37, at 22.  Therefore, State Farm argues that it "has paid all that was owed to [p]laintiff under her [p]olicy" and is entitled to summary judgment on plaintiff's breach of contract claim.  Dkt. # 37, at 22.  Plaintiff alleges that she followed Abbage and Stanley's instructions for providing her inventory list as required under her policy, and found it reasonable that their instruction to discard and not photograph or document the smaller ticket items that composed most of her lost items list was "standard procedure."  Dkt. # 54, at 2.

According to the Supreme Court of Oklahoma, parties to an insurance contract "are at liberty to contract for insurance to cover such risks as they see fit and are bound by the terms of [the] contract and courts will not undertake to rewrite the terms thereof."  Dodson v. St. Paul Ins. Co., 812 P.2d 372, 376 (Okla. 1991) (quoting Wiley v. Travelers Ins. Co., 534 P.2d 1293, 1295 (Okla. 1974)).  Moreover, "[t]he terms of the parties' contract, if unambiguous, clear, and consistent, are accepted in their plain and ordinary sense . . . .  [Accordingly,] [t]he interpretation of an insurance contract and whether it is ambiguous is a matter of law for the Court to determine and resolve accordingly."

9

Id.  Finally, the Supreme Court of Oklahoma has found that the test for whether contract terms are ambiguous is whether they are "susceptible to two interpretations on [their] face.  This test for ambiguity is applied from the standpoint of a reasonably prudent lay person, not from that of a lawyer."  Cranfill v. Aetna Life Ins. Co., 49 P.3d 703, 706 (Okla. 2002) (internal quotations and citations omitted).

In this case, plaintiffs' policy includes conditions, including the insured's "duties after loss." Dkt. # 37-1, at 36.  The policy states that the insured "must cooperate with [State Farm] in the investigation of the claim.  Id.  It also requires that the insured "protect the property from further damage or loss" and "keep an accurate record of repair expenses."  Id.  In addition, the insured must see that an "inventory of damaged . . . personal property" is prepared, "(1) showing in detail the quantity, description, age, replacement cost, and amount of loss; and, (2) attaching all bills, receipts, and related documents that substantiate the figures in the inventory."  Id.  Finally, the insured has a duty to "exhibit the damaged property" or "provide [State Farm] with any requested records and documents" "as often as [State Farm] requires.  Id.

The Court finds that State Farm's policy language as to plaintiff's duties after loss is unambiguous, clear, and consistent.  The conditions in the written policy require the insured to cooperate with State Farm's investigation of the claim, including by providing it with information to substantiate the value of the claim and allow State Farm to examine the damaged property.  The Court finds that these specific policy conditions related to the insured's duties following loss are not subject to more than one meaning from a lay person's perspective.  See Cranfill, 49 P.3d at 706. Thus, the Court accepts the policy terms in their plain and ordinary sense and plaintiff is bound by

the terms of their insurance contract with respect to her duties following the loss.  See Dodson, 534 P.2d at 376.

However, there is a genuine dispute of material fact as to whether State Farm representatives, Abbage and Stanley, instructed plaintiff to discard her contents prior to preparing and submitting her inventory list.  According to plaintiff's testimony, she prepared an inventory of the damaged items as per the instructions of State Farm's representatives.  Plaintiff testified that shortly after the fire, she specifically asked Abbage what she needed to do, whether she needed to take photos and, if so, should the contents be photographed individually or grouped together.  Dkt. # 37-4, at 2.  She testified that, in response, Abbage told her not to take photos of her items, specifically, that "if [the smaller items were] under approximately $800" then "he didn't need photos of it."  Id., at 2-3. Plaintiff also testified that "[Abbage] directed me not to take photos and to throw things away".  Id. at 10.  In addition, plaintiff testified that Stanley instructed her to "[t]hrow away every single food item, every single medicine, every single body product, beauty product, makeup, because it's all toxic.  Needs to go in the trash."  Id. at 11.  Given the context and circumstances, a jury could reasonably find that in following these alleged instructions, plaintiff complied with the conditions of the policy.

If State Farm instructed plaintiff to discard the contents without photographing them, and then later denied the remainder of her claim due to the lack of photographs to corroborate the claim, then a trier of fact could find that denial to constitute a breach of contract.  This is especially likely for many of the smaller items such as toiletries or makeup, etc., because there would not be reasonably accessible alternative corroborating documents such as copies of purchase receipts or invoices.  The Court notes that even if a jury were to find that the facts amount to a breach of

contract, that conclusion does not address damages. The parties would still have to demonstrate what, if any, damages plaintiff suffered as a result of such a breach.

At this summary judgment stage the evidence in the record is construed most favorably to the non-movant, in this case the plaintiff. Garratt, 164 F.3d at 1251. The details about documenting and cataloguing the lost items, including whether State Farm's representatives advised plaintiff to discard her items without securing evidentiary documentation, are questions for the jury to determine. Therefore, the Court denies defendant's motion for summary judgment as to plaintiff's breach of contract claim.

      *b.*    *Bad Faith*

Defendant argues that plaintiff's bad faith claim fails as a matter of law. Dkt. # 37, at 23. First, defendant argues that plaintiff's bad faith claim fails because her breach of contract claim fails. Dkt. # 37, at 23. Because the Court finds that plaintiff's breach of contract claim does not fail, it does not address that part of defendant's brief. However, defendant also argues that "[e]ven if" it breached its contract with plaintiff, the bad faith claim still fails because there is a "legitimate dispute as to the value of [p]laintiff's content claim," and there is "simply no evidence whatsoever to support [p]laintiff's claim of bad faith based on State Farm's investigation and evaluation." Id. at 25. Plaintiff argues that "State Farm denied the list in its entirety without any investigation, research of replacement value or discussion as to any description of an item, the accuracy of the list, or any offer of a proposed value for [plaintiff's] personal content." Dkt. # 54, at 3.

The Oklahoma Supreme Court has held that "an insurer has an implied duty to deal fairly and act in good faith with its insured and that the violation of this duty gives rise to an action in tort for which consequential and, in a proper case, punitive, damages may be sought." Christian v. Am.

Home. Assurance Co., 577 P.2d 899, 904 (Okla. 1977).  "The core of a bad-faith claim 'is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy.'"  Flores v. Monumental Life Ins. Co., 620 F.3d 1248, 1255 (10th Cir. 2010) (quoting McCorkle v. Great Atl. Ins. Co., 637 P.2d 583, 587 (Okla. 1981)).  To succeed on a bad faith claim, plaintiff "must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of [plaintiff's] claim."  Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1436 (10th Cir. 1993); accord Shotts v. GEICO Gen. Ins. Co., 943 F.3d 1304, 1314 (10th Cir. 2019).  According to the Tenth Circuit, courts generally use a two-step analysis to determine whether a plaintiff has made a sufficient showing of bad faith.  Shotts, 943 F.3d at 1314-15.  The Court considers 1) "whether there is a legitimate dispute between the insurer and the insured regarding coverage or the value of the claim"; and 2) "if the court determines there is a legitimate dispute between the parties, . . . whether the plaintiff offered specific additional evidence to demonstrate bad faith."  Id. at 1315.  "The additional evidence required for this showing" may include evidence that 1) "the insurer did not *actually* rely on th[e] legitimate [dispute] to deny coverage"; 2) the insurer "denied the claim for an illegitimate reason"; 3) the insurer "otherwise failed to treat the insured fairly"; and 4) "the insured performed an inadequate investigation of the claim."  Id. (internal quotations and citations omitted) (emphasis and alterations in Shotts, 943 F.3d at 1315).

For step one, the Court finds that there exists a legitimate dispute between plaintiff and defendant regarding coverage and the total value of the claim.  Defendant State Farm sent a specialist to inspect plaintiff's dwelling damage, who created an estimated replacement cost value for repairs and also saw the condition of plaintiff's home and at least some of its contents.  Abbage, another

representative who was assigned to handle plaintiff's claim, discussed the content process with plaintiff. Rather than using a professional company to pack and determine what items were and were not salvageable, plaintiff decided to handle that process herself, and then cleaned most of the salvageable content herself. State Farm then reviewed the information provided by plaintiff about the items that were not salvageable and consistently questioned its validity and accuracy compared to its understanding of the damage caused by the fire. Thus, there is a legitimate dispute as to the extent and valuation of damage to plaintiff's contents.

For step two, the Court finds that plaintiff has failed to offer sufficient evidence of defendant's bad faith. Plaintiff presents no facts from which a reasonable jury could find that State Farm did not actually rely on the legitimate dispute to deny the claim; denied the claim for an illegitimate reason; treated plaintiff unfairly; or performed an inadequate investigation. The undisputed facts establish that State Farm sent a claims specialist to inspect plaintiff's home and another representative discussed the contents process with plaintiff. In addition, plaintiff's assertion that defendant "denied the list in its entirety without any investigation, . . . research, . . . or discussion" is not supported by the evidence. On the contrary, the undisputed facts also establish that plaintiff's lost item list was reviewed by Abbage and Stanley, who determined the quantity and value of the items on the list was inconsistent with the damage caused by the fire. Abbage spoke with plaintiff about that issue and sought any additional information that could corroborate the information plaintiff submitted on the list. All the while, Abbage and State Farm continued to work on other aspects of plaintiff's claim related to the fire. Taken together, these facts demonstrate that State Farm investigated the claim and discussed with plaintiff multiple times the deficiencies of the part of the claim that pertained to plaintiff's lost items.

In addition, plaintiff's testimony alleging that Abbage and Stanley instructed her to discard all of those items and not photograph items under a certain dollar value do not amount to bad faith. The dispute arose when the lost item list contained many more items at a much higher value than what defendant's representatives anticipated or had seen in their previous experience with comparable claims. That defendant's representatives may have given different instructions had they known the full scope of what plaintiff would subsequently claim does not present evidence that defendant acted in bad faith. Any alleged errors defendant made in instructing plaintiff about creating the lost item list, and their potential effect on State Farm's conclusions and decision to not pay plaintiff for the value of the list are legitimate questions of fact with respect to plaintiff's breach of contract claim. On the other hand, plaintiff presents no direct evidence of defendant's intentional bad-faith conduct.

That State Farm concluded the quantity and value of items in plaintiff's lost item list was inconsistent with the damage caused by the fire is sufficient to substantiate that there is a legitimate dispute as to the extent and valuation of damage. It does not, however, raise any evidence of intentional bad faith conduct. Therefore, the Court grants defendant's motion for summary judgment as to plaintiff's bad faith claim.

   c.    *Punitive Damages*

Under Oklahoma law, a jury may award punitive damages "[w]here the jury finds by clear and convincing evidence that . . . [a]n insurer has recklessly disregarded its duty to deal fairly and act in good faith with its insured[.]" OKLA. STAT. tit. 23, § 9.1(B)(2). Thus, a punitive damages claim is "dependent upon bad faith for its basis." Peters v. Am. Income Life Ins. Co., 77 P.3d 1090, 1099 n.9 (Okla. Civ. App. 2002). Accordingly, plaintiff's claim for relief based on punitive damages

15

fails as a matter of law, and the Court grants defendant's motion for summary judgment as to the issue of punitive damages.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Dkt. # 37) is **denied in part** and **granted in part.**  Defendant's motion is **denied** as to plaintiff's breach of contract claim, but **granted** as to plaintiff's bad faith claim and the issue of punitive damages.

**DATED** this 21st day of November, 2022.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE